**C–T OF VIRGINIA, INC., f/k/a Craddock–Terry Shoe Corporation, Plaintiff,**

v.

**James S. BARRETT, II, et al., Defendants.**

Civ. A. No. 90–0024–L.

United States District Court,
W.D. Virginia,
Lynchburg Division.

Aug. 10, 1990.

Edward B. Lowry, Charlottesville, Va., Harold Bonacquist, Traub, Bonacquist, Yellen & Fox, New York City, for plaintiff.

William Tracey Shaw, Lynchburg, Va., Benjamin C. Ackerly, Hunton & Williams, Richmond, Va., for defendants.

## MEMORANDUM OPINION

KISER, District Judge.

This matter is before me on the motion to dismiss filed by the defendants on October 20, 1989, in the United States Bankruptcy Court for the Western District of Virginia, Lynchburg Division. This case was transferred to the United States District Court for the Western District of Virginia, Lynchburg Division, on April 4, 1990. The defendant's motion has been briefed and argued and, therefore, this matter is now ripe for disposition.

## Background

This is an adversary proceeding brought by the Official Committee of Unsecured Creditors of C–T of Virginia, Inc. ("C–T"), formerly Craddock–Terry Shoe Corporation on behalf of C–T of Virginia against certain former directors and officers of Craddock–Terry. This suit arises out of a statutory merger approved by Craddock–Terry directors in January 1986 and consummated in April 1986. The background of this merger is as follows:

In April 1985, C–T hired Prudential–Bache Securities, Inc. ("Prudential"), as financial advisor to study strategic financial alternatives available to C–T. Prudential presented the results of its study to C–T's Board of Directors on May 20, 1985. One of Prudential's recommendations was that C–T pursue a leveraged buy out ("LBO"). The Board decided that an LBO by management would most likely realize maximum value for shareholders because it (i) would provide the highest expected value to shareholders and had a high probability of success, (ii) would maintain the viability of the enterprise, and (iii) would protect the interests of employees and other constituents. The Board authorized management to explore an LBO at a price of $15 per share.

On June 12, 1985, after an announcement of a proposed LBO by management, C–T received an unsolicited proposal from Southwestern General Corporation proposing a merger under which holders of C–T would receive $17.50 per share. Southwestern withdrew its offer on August 26, 1985, following an announcement by President Reagan that he would not limit the importation of shoes into the United States.

On November 11, 1985, HH Holdings, Inc., a Delaware holding company, made an unsolicited offer for a cash merger in which each share of C–T common stock would be exchanged for $19.00 cash.

On November 25, 1985, HH Holdings increased its offer to $20.00 cash per share of C–T common stock. As a result of negotiations, an Agreement in Principle was signed on December 11, 1985, and an Agreement and Plan of Merger ("Merger Agreement") was executed on January 24, 1986, between C–T, HH Holdings and HH Acquisition, Inc., a wholly-owned subsidiary of HH Holdings formed for the purpose of completing the proposed merger. The Merger Agreement provided that on April 30, 1986, HH Acquisition would merge into C–T, with C–T as the surviving corporation owned by HH Holdings. On April 30, 1986, the merger was consummated.

The plaintiff claims that as of January 20, 1986, the officers and directors of C–T knew, or should have known that:

1. Financing the proposed merger required not less than $43.66 million in cash to pay stockholders, creditors, and transaction costs;

2. HH Holdings intended to raise most of the money needed to finance the merger by obtaining short-term debt financing secured by liens on the assets of C–T;

3. Repayment of the secured debt would require C–T to increase sales or reduce costs;

4. C–T's financial performance was significantly below management projections; and

5. C–T would be grossly undercapitalized if the merger were consummated.

The plaintiff alleges that as a result of the financial burdens placed by the merger, the C–T became unable to pay its debts and was forced to file for bankruptcy. First, the plaintiff claims that the defendants, who approved or assisted in the consummation of the merger, breached their fiduciary obligation imposed pursuant to Va.Code Annot. § 13.1–690 to exercise the highest care, loyalty and good faith in their dealings with respect to C–T. Secondly, the plaintiff claims that the payments made to stockholders pursuant to the merger constituted distributions to shareholders, within the meaning of Va.Code Annot. § 13.1–603, which violated Va.Code Annot. § 13.1–653.

## Motion to Dismiss

The defendants filed their motion to dismiss on the grounds that the defendants

did not breach any fiduciary duty owed to pre-merger shareholders of Craddock–Terry, and owed no fiduciary duty to post-merger shareholders and creditors or to the acquiring company. The defendants further argue that the plaintiff's claim based on breach of fiduciary duty is barred by the statute of limitations, and that a distribution within the meaning of § 13.1–653 was not made.

### 1. Fiduciary Duty

■ The defendants argue that under *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del.1986), their legal duty in approving a merger offer was to obtain for shareholders the highest price possible for the company. Under corporation law developed in Delaware, "corporate directors have a fiduciary duty to act in the best interests of the corporation's shareholders." *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 955 (Del.1985). This duty is paramount when directors undertake to sell their company requiring directors to maximize the company's value for the sole benefit.

As stated in *Revlon:*

> When Pantry Pride increased its offer to $50 per share, and then to $53, it became apparent to all that the break-up of the company was inevitable. The Revlon board's authorization permitting management to negotiate a merger or buyout with a third party was a recognition that the company was for sale the duty of the board ... thus changed from the preservation of Revlon as a corporate entity to the maximization of the company's value at a sale for the stockholder's benefit.

*Id.* at 182.

The Delaware Court further explained the two circumstances that implicate *Revlon* duties in *In re Time, Incorporated Shareholder Litigation*, 571 A.2d 1140 (Del.1989):

> The first, and clearer one, is when a corporation initiates an active bidding process seeking to sell itself or to effect a business reorganization involving a clear break-up of the company.

*Id.* (citations omitted).

■ The plaintiff argues that *Revlon* duties were not applicable to the HH holdings and C–T merger because the "sale" of C–T in a transaction "involving the clear break-up of the company" was not inevitable. Where the sale of a company is not inevitable, *Unocal* requires that a board approve a takeover bid only if it is in the best interests of the company. This determination is made based on an analysis of the takeover bid and its effect on the corporate enterprise taking into account concerns such as the "impact on 'constituencies' other than shareholders (i.e., creditors, customers, employees and perhaps even the community generally) ..." *Unocal*, 493 A.2d at 954–55 (Del.1985).

In order to determine whether *Revlon* or *Unocal* duties applied to the business judgment by C–T at issue in this case, I must determine whether C–T initiated an active bidding process to sell itself or effect C–T's reorganization.

■ The defendants assert that the Board's announcement on May 17, 1985, that it had authorized the sale of the company to management in an LBO signalled that the company was for sale. I agree. This fact is evidenced by the Board's subsequent receipt of bids from Southwestern and HH Holdings. At this point, the Board was not merely considering a possibility of merger with a particular corporation; it had already determined that the best way to serve shareholder interests was to place the firm on the market. A Proxy Statement allowing the Board some flexibility if the shareholders were to reject the LBO is not evidence to the contrary; this does not appear to have been intended to take the company out of the market, but only to preserve the Board's negotiating position with other bidders. *Black & Decker Corp. v. American Standard, Inc.*, 682 F.Supp. 772, 780 (D.Del.1988). Accordingly, the directors' duties were limited to those specified by *Revlon:* to gain the highest possible price for its shareholders. The duty

cannot extend to the interests of current or future unsecured creditors of the company.

## II. Statute of Limitations

█ In addition to the substantive grounds for dismissal of the suit listed above, I believe that this action is time-barred. The law of Virginia applies and under Virginia law, a suit alleging breach of fiduciary duty by a corporate officer is a tort, not a contract claim. *Winston v. Gordon,* 115 Va. 899, 80 S.E. 756 (1914). The breach alleged here is of duty, not of contract. Under Va.Code § 8.01–248, a tort action is subject to a one year limitations period. Accordingly, the relevant limitations period is one year from accrual of the cause of action.

█ The next issue is the moment in time when the plaintiff's claim accrued. Plaintiffs argue that the claim should not be considered to commence until it should have been discovered, while defendants assert that the action arose when the last act causing the date of injury occurred, no later than the date of the merger, April 30, 1986. Va.Code § 8.01–230 states, "the cause of action shall be deemed to accrue and the prescribed limitation period shall begin to run from the date the injury is sustained ... and not when the resulting damage is discovered," subject to very limited exceptions. The only exception arguably applicable is that in Va.Code § 8.01–249, subd. 1, which states that actions involving fraud, mistake, or undue influence accrue when the breaches could reasonably have been discovered. This statute clearly implies that discovery of injury is irrelevant to accrual of cause of action in all other cases. See *Granahan v. Pearson,* 782 F.2d 30, 34 (4th Cir.1985) (applying Virginia law; medical malpractice claim accrued at time of injury, even though principal injury, sterility, was not discovered until five years later). The breaches of fiduciary duty alleged in this complaint do not involve fraud, mistake, or undue influence. Accordingly, the cause of action accrued no later than the date of the merger, and was time-barred before commencement the automatic stay caused by the October 21, 1987 bankruptcy petition. The action accrued at the same time for unsecured creditors as for C–T itself, even though the creditors were not in a position to discover the breach.

## III. Distribution

█ Plaintiffs further contend that the merger of Craddock–Terry was a "distribution" to shareholders, and as such, falls under the statutory requirements of Va. Code 13.1–653. They assert that the Board of Directors failed to comply with the terms of that statute, which states, "No distribution may be held if, after giving it effect: The corporation would not be able to pay its debts as they become due in the usual course of business ..." Defendants argue that the merger did not include a distribution, and in any event, they did not violate the statute, because after the merger the firm remained capable of paying its usual debts.

Va.Code § 13.1–603 defines "distribution" as

a direct or indirect transfer of money or other property, except its own shares, or incurrence of indebtedness by a corporation to or for the benefit of its shareholders in respect of any of its shares. A distribution may be in the form of a declaration or payment of a dividend; a purchase, redemption, or other acquisition of shares; a distribution of indebtedness of the corporation; or otherwise.

This language is intentionally broad. The phrases "other acquisition of shares" and "or otherwise" demonstrate that the substance, and not the form of the transaction, determines whether a distribution occurred. In addition, granting a motion to dismiss would be inappropriate if any set of facts would support the characterization as a distribution. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

Plaintiff argues that the Board of Directors accomplished the buyout by using C–T's credit and assets as collateral, and this encumbrance of assets allowed the shareholders to receive cash for their shares. By this characterization, the statu-

**694**

tory definition of "distribution" may well have been met: The Board's arranging financing for the purchase of shares had the effect of borrowing against current assets to pay cash to shareholders. Even though it did not pledge assets directly to the shareholders, its encumbering assets was "for the benefit of its shareholders." See *Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488, 511 (N.D.Ill.1988).

Defendant contends that the following chain of events occurred in the merger: C–T shares were converted into the right to receive Merger consideration at the same that HH Acquisition, Inc. shares were converted into shares of C–T. This resulted in every previous shareholder of C–T receiving $20 per share, and HH Acquisitions receiving 100% control of C–T; however, the shareholders of C–T received compensation only from HH Holdings, and not from C–T. Finally, defendants assert that this transaction is authorized by Virginia's statutory merger procedure, Va.Code § 13.1–716 et seq., and that statute is the only source of regulation over mergers.

On a motion for dismissal, I must consider all disputed facts from the point of view of the plaintiff. If, as alleged, the defendants actively participated in encumbering the property of C–T, and this was a distribution to shareholders clothed in the garb of a merger then the plaintiff has stated a cause of action by alleging a violation of Va.Code § 13.1–653.

The Clerk is directed to send a certified copy of this Order to all counsel of record.

### ORDER

For the reasons stated in the Memorandum Opinion filed contemporaneously herewith, it is hereby ADJUDGED and ORDERED as follows:

1. Defendant's motion to dismiss plaintiff's first claim for relief is hereby GRANTED.

2. Defendant's motion to dismiss plaintiff's second claim for relief is hereby DENIED.

The Clerk is directed to send a certified copy of this Order to all counsel of record.